IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 3, 2019

## IN RE CHARLIE-LYNN P., ET AL.

**Appeal from the Juvenile Court for Montgomery County**
**No. 17-JV-515, 17-JV-516      Tim Barnes, Judge**

---

**No. M2018-02285-COA-R3-PT**

---

This appeal concerns the termination of a mother's parental rights to her children.  The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Montgomery County ("the Juvenile Court") seeking to terminate the parental rights of Matia P. ("Mother") to her minor children Charlie-Lynn P. and Pharaoh P. ("the Children").  After a trial, the Juvenile Court entered an order terminating Mother's parental rights on the grounds of failure to establish a suitable home, substantial noncompliance with the permanency plan, and persistent conditions.[1]  The Juvenile Court also found that termination of Mother's parental rights is in the Children's best interest.  Mother appeals, arguing only that termination of her parental rights is not in the Children's best interest because she has taken certain steps to address her mental health and domestic violence issues.  We find and hold that the Juvenile Court did not err in finding that clear and convincing evidence was shown as to all three grounds.  We find and hold further that, notwithstanding Mother's purported improvements, the Juvenile Court did not err in finding by clear and convincing evidence that termination of Mother's parental rights is in the Children's best interest.  We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. and KENNY W. ARMSTRONG, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Matia P.

---

[1] The Juvenile Court also terminated the parental rights of Charlie-Lynn's legal father and two putative fathers of Pharaoh, but these men are not participating in this appeal.  We address only the termination of Mother's parental rights.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## Background

Mother gave birth to Charlie-Lynn in November 2010 and Pharaoh in May 2014. In April 2015, the Children entered state custody after Mother was involuntarily hospitalized because of a mental health issue. DCS thereafter filed a petition in the Juvenile Court seeking temporary legal custody of the Children, and a protective custody order was entered. Two permanency plans were developed later for Mother, with an emphasis on rectifying her mental health and domestic violence issues. In September 2015, the Juvenile Court adjudicated the Children dependent and neglected. In March 2017, DCS filed a petition seeking to terminate Mother's parental rights to the Children. Trial was held in October 2018.

Maleka Holmes ("Holmes"), a DCS foster care team leader on the Children's case, testified regarding DCS's involvement in the matter:

Q. Do you recall when [the Children] entered state's custody?
A. Yes, ma'am.
Q. And what is that date?
A. April 4, 2015.
Q. And was there an adjudication in this matter?
A. Yes, ma'am.
Q. And were the children found to be dependent and neglect[ed] during that adjudication?
A. Yes, ma'am.
Q. And what were the reasons why the children were found to be dependent and neglect[ed]?
A. [Mother] had a hospital stay. During her hospital for mental health issues, there were no one to supervise the children at that time and the children were brought into custody.
Q. So from April 4, 2015, what would be the four-month mark after those children were brought into state's custody?
A. July 28, 2015.
Q. I think it would be August.
A. August. I'm sorry. August.
Q. So the time period after the children came into custody on April 4, four months following that would be August the 4th, correct?

-2-

A. Yes, ma'am.

Q. So during that time period, the first ground that you have alleged -- or the first ground that we are going to address is the mother's failure to provide a suitable home; is that correct?

A. Correct.

Q. And that is the time period statutorily that the mother had to find a suitable home; is that correct?

A. Correct.

Q. Was the mother -- during the duration of this case, are you aware of any times that the mother signed or was provided with a copy of the notice and criteria for termination for parental rights?

A. Yes, ma'am.

Q. And are you aware of the dates that she signed the notice and criteria for termination of parental rights?

A. Yes, ma'am.

***

Q. And what reasonable efforts did the Department make in that four-month time frame to provide [Mother] with a suitable home?

A. Well, during that time, I believe that the Department informed [Mother] of different housing options. During that time, I believe [Mother] had a family member that was living in, maybe, Nashville. I know that [Mother] informed the Department, during that time, that she could not find a home that she could afford, so the Department provided her with a list of affordable housing.

Q. Was it also in the permanency plan -- did it say that she needed to have safe and stable housing?

A. Yes, ma'am.

Q. And in that permanency plan that the Department developed during that time frame, did we have specific tasks that would remedy why the children came into custody?

A. Yes, ma'am.

Q. And did we lay out those tasks for [Mother]?

A. Yes, ma'am.

Q. And did we offer any kind of transportation to and from her assessments in order to get those tasks completed?

A. Yes, ma'am.

***

Q. (By Ms. Parker) So as far as during that time frame, where did [Mother] live?

A. [Mother] has not provided the Department with a physical address.

Q. So to the Department's knowledge, [Mother] did not have a home during that time frame?

A. Yes, ma'am, correct.

Q. And during that time frame, was the Department ever able to go out and view a home, do a home visit? Were we aware of where [Mother] was even residing during that time period?

A. No, ma'am, we were not.

Q. And during that time period, did [Mother] complete any of her services?

A. [Mother] started services, but she did not fully complete and follow through with the recommendations of the services.

Q. So what did [Mother] complete during that time period?

A. If I can refer to my notes?

Q. Yes.

A. [Mother] had a clinical assessment at Centerstone on April 14, 2015. The recommendations from that assessment was weekly individual counseling, case management, as well as medication management. The Department was not able -- we were able to receive documentation that she started so -- it would be, like, two weeks she would go, and then she wouldn't go for another two weeks. So it was not continuous. [Mother] also completed an A&D assessment. The first one was at Bradford on February 15, 2017. The recommendation for that one was partial hospitalization for --

Q. But none of those were completed during this time period?

A. Correct.

Q. Okay. I just want to know, was anything completed during that time period?

A. [Mother] completed the assessment. She did not complete the recommendations of the assessment.

Q. Okay. So during that time period, the only thing that would have been completed was the initial assessment, correct?

A. Yes, ma'am.

Q. And so at no time during that four-month time period, were we able to actually reunify the children with her?

A. No, ma'am.

Q. And she didn't even have a physical dwelling place during that four-month time period?

A. Yes, ma'am, that's correct.

-4-

Q. And how many months have passed since the children were placed in state's custody? And by me asking that, how many months have passed from the time the children were in state's custody to the time that the Department filed the termination of parental rights petition?

A. I would say around 22 months -- 22, 23 months.

Q. And 22 months had passed then. Had she successfully completed any of her recommendations on that permanency plan when we filed this petition?

A. Not when we filed the petition.

Q. And so as we sit here today, how many months have passed?

A. Forty-two months.

Q. And as we sit here today, has she successfully completed everything on her permanency plan?

A. Everything on her permanency plan?

Q. That's correct. Would we be able to return the children to her care today?

A. Not at this time.

Q. Okay. And [the Children] are in an adoptive home; is that correct?

A. Yes, ma'am.

Q. If so if the parental rights of the mother were continued, what effect would that have on [the Children]?

A. If the parental rights were continued with [Mother], I think that it would send a different message. They have been in custody for over 42 months. So at this point, they know that they visit [Mother] and they enjoy visiting with [Mother]. But as far as a parent-child relationship, [Mother] has not had that role for quite some time.

***

Q. So, to your knowledge, how long did that plan -- how long -- what's the time period that we were talking about that initial permanency plan? How long did she have to complete the tasks on that permanency plan?

A. She actually had until October the 20th, 2015. So about six months.

Q. Okay. And is that standard for all of our permanency plans to last on or around six months?

A. Yes, ma'am.

Q. And so she initially completed the clinical assessment; is that correct?

A. Yes.

Q. Did she follow all the recommendations during that time period?

A. The Department, at this time, we do not have that she continuously followed the recommendations. She did start individual counseling,

medication management, as well as case management, and then she would stop, and then she would start back again.

Q. Okay. And the A&D assessment, did she complete the A&D assessment during that time frame?

A. Yes, ma'am.

Q. And what were the recommendations from the A&D assessment?

A. [Mother] had an A&D assessment on February the 6th, 2017. So --

Q. So that wouldn't have been --

A. -- that wasn't the time frame.

Q. So she did not complete the A&D assessment --

A. No, ma'am.

Q. -- during that time frame?

A. (Shakes head side to side.)

Q. Okay. Did she pay child support of $30 per month per child?

A. No, ma'am.

Q. Did she resolve her legal issues during that time?

A. No, ma'am.

Q. And, in fact, did she also get arrested again during that time frame?

A. Yes, ma'am.

Q. Did she have safe and stable housing prior to -- I believe you stated October --

A. 20th.

Q. -- 20, 2015?

A. No, ma'am.

Q. Okay. So the only thing she completed during that time period was she did a clinical assessment?

A. Yes, ma'am.

***

Q. Okay. And we had actually filed this perm -- or we had actually filed the termination of parental rights on March 20 -- no, I'm sorry. Okay. So from October of 2015 to June 9, 2016, is the time frame of the second permanency plan; is that correct?

A. Correct.

Q. And so during that time frame, had she resolved all of her legal issues?

A. No, ma'am.

Q. Did she have an A&D assessment during that time frame?

A. No, ma'am.

Q. Did she have legal income during that time frame?

A. Not that the Department is aware of.

-6-

Q. Has she paid any kind of child support as far as $30 a month per child?
A. No, ma'am.
Q. She did her clinical assessment. But during that time frame, did we have any -- did we have any documentation that she was taking her medications as prescribed?
A. No, ma'am.
Q. Did she provide the Department with any documentation that she was following through with her individual therapy?
A. No, ma'am.
Q. And did she provide the Department with any documentation that she was following through with her medication management?
A. No, ma'am
Q. And during that time frame, are we aware that she had any kind of stable housing?
A. No, ma'am.

***

Q. And this TPR petition was filed March 28, 2017, correct?
A. Yes, ma'am.
Q. And how many months from the time that the children came into custody to that date were the -- had the children been in custody?
A. Twenty-two months.
Q. And at that 22-month mark were the conditions which placed the children into state's custody, do they still exist?
A. Yes, ma'am.
Q. Had [Mother] addressed any of her mental issues?
A. No, ma'am.
Q. And, in fact, new issues had arisen during the pendency of this case; is that correct?
A. Yes, ma'am.
Q. And what were those new issues?
A. Domestic violence.
Q. And when you say domestic violence, was [Mother] actually arrested for domestic violence during the pendency of this case?
A. Yes, ma'am.
Q. And was that domestic violence between her and Mr. [H.]?
A. Yes, ma'am.
Q. And so that would have been on or about -- sometime in November of 2016?
A. Yes, ma'am.

Q. And did we address those domestic violence issues in subsequent permanency plans?

A. Yes, ma'am.

Q. And what did we address in subsequent permanency plans? What tasks did we require for her to complete?

A. We asked [Mother] to do domestic violence classes.

Q. And as we sit here today, has [Mother] successfully completed domestic violence classes?

A. Yes, ma'am.

Q. When did she complete those domestic violence classes?

A. I believe it was in 2017.

Q. So it was after we filed this TPR petition?

A. Correct.

Q. And after she completed the domestic violence classes, was she then subsequently arrested again for domestic violence between her and Mr. [H.]?

A. Yes, ma'am.

Q. So, in your opinion, did the domestic violence classes that she did help her in any way to resolve that issue?

A. No, ma'am.

On cross-examination, Holmes was questioned as to Mother's progress in the case:

Q. Okay. Now, on the suitable housing ground, now she had moved into government housing October 31st of 2016, isn't that correct, a two-bedroom house?

A. The documentation that I have stated that she moved in around 2017. It was later 2017, around October.

***

Q. (By Ms. King) Now, you testified that she had completed a clinical assessment and was following the recommendations and was going and taking a break. Do you know if she was unable to be there or if her TennCare wouldn't allow weekly visits?

A. No, ma'am, I do not know.

Q. Okay. So it's possible that she was going when she was able to, even if it wasn't every week, as recommended, but that she had gone to her recommendations, based on that clinical assessment, and she had been participating at that time, hadn't she?

A. Well, based on the clinical assessment, the recommendations were that she would attend weekly counseling, case management, and medication management. The documentation that the Department of Children's Services received, it was not weekly. Again, so I cannot -- she did not follow the recommendations of the weekly counseling.

Q. Okay. But it was -- she had gone and she was participating; it just wasn't every single week?

A. Yes, ma'am.

Q. Okay. But you're not sure if -- I mean, it could have been she was unable to because of her insurance or healthcare that it couldn't have been weekly; isn't that possible?

A. That is possible. The documentation though, that was in TFACTS, never stated that there was any insurance issues.

Q. Okay. And then she had done some type of A&D assessment at some point --

A. Yes, ma'am.

Q. -- that had no recommendations?

A. One had no recommendations. And then she went back -- she apparently tested positive or stated that she would test positive, so she went back twice. In total of this case, she's had three A&D assessments.

***

Q. (By Ms. King) Okay. She had three assessments?

A. Yes.

Q. And did one have recommendations?

A. Two had recommendations.

Q. Okay. And had she followed or began -- or was that ongoing?

A. The recommendations from February 2017 said partial hospitalization.

Q. Okay.

A. She did not complete that.

Q. Okay. Now, how long have you been a caseworker on this case?

A. Off and on for four years -- or three and a half years that this case has been involved.

Q. So you know that she had been arrested, what? 2016? 2017? 2018?

A. Yes, ma'am.

Q. Okay. And you also are aware that all of those charges have since been dismissed?

A. Yes, ma'am.

Q. Okay. Now, on the persistence of conditions, you testified earlier that you didn't believe that she had completed enough to return the kids. Can you tell the Court why?

A. [Mother] has completed things to this -- to this time frame. The main concern of the Department is safety. There continues to be domestic violence situations that have happened between [Mother] and Mr. [H.] or [Mother] and another person. And at this time, we don't -- we, as a department, cannot ensure these children's safety.

Q. And it's because of the father, Mr. [H.]?

A. Sometimes [Mother] is also the aggressor, so they go back and forth.

Q. Okay. Now, on her mental health treatment, I mean, is that something that's continuous and is ongoing and it has been ongoing?

A. As of today, [Mother] has continued with mental health treatment.

Q. Okay. And as of today, does she still live in a two-bedroom house -- government house? She hasn't been kicked out?

A. As of today, [Mother] still lives in the government home.

Q. Okay. But at some point, the Department said, Oh, if you violate rules, they're going to kick you out, and she had been there since, what, 2016, and then still is residing there?

A. I do not have any documentation that says '16, but I do know from the time that I received documentation, that she has housing there, she has been living there.

Q. Okay. Her med management, has that been ongoing also?

A. I do not have any documentation that [Mother] is taking medication. I do know at some point [Mother] felt like she did not need to take medication.

Q. Okay. So it might have been recommended by a doctor whether she took it or not, possibly?

A. The Department does not have any documentation that states that --

Q. Okay.

A. -- she didn't need to take it.

Q. Now, you also testified about the domestic as persistence of conditions. I mean, her charges have all been dismissed. She had taken the domestic violence classes as she was required to, and she's been --

A. Yes, ma'am.

Q. -- participating and working hard and trying to get her kids back. And you testified earlier that the domestic violence classes obviously didn't work because she had been arrested three times, but all of those charges have since been dismissed; is that correct?

A. Yes, ma'am.

Q. Okay. She has maintained contact with the kids?

A. Yes, ma'am. [Mother] does do therapeutic visitation with her children.

Q. Now, as far as her income, did she have -- would getting arrested multiple times have an impact on whether you can secure employment and show income, especially for domestic assault type cases?

A. Yes, ma'am.

Q. Okay. And has she been able to support herself, to your knowledge?

A. Yes, ma'am.

Q. Okay. And if she had broken all ties with Mr. [H.], would you have felt that it would have been safe -- would have been a safe environment for the kids to return to the mom?

A. No, ma'am.

Q. And why is that?

A. Early summer of this year there was an altercation that happened in her neighborhood where [Mother] and another gentleman from the community got into a physical altercation. No one was arrested, but the Department does have proof of that.

Q. But no charges ever happened --

A. No charges.

Q. -- on any of the parties?

A. Correct.

Lakendra W. ("Foster Mother"), the Children's foster mother, testified next. Foster Mother testified regarding how the Children were doing in her care, as well as her concerns about any possible return of the Children to Mother's care. Foster Mother stated, in part:

Q. And how long have they been in your home?

A. For three years now.

Q. And are you a preadoptive home?

A. Yes, ma'am, I have always been.

Q. If the opportunity was provided to you, would you be willing to adopt them?

A. Yes, ma'am.

Q. So just talk a little bit about how they are doing in your home. What do they like to do?

A. Okay. They are doing great. We actually just got Charlie's report card. Of course, she's super smart. She's been that way since I got her, and she's progressed so much. She's in cheerleading and she's in the church choir. Pharaoh is doing awesome. He is actually in Head Start. He's doing really well. He's four years old. We're learning names and numbers and everything that you can think of, and he's -- he's always hungry.

-11-

Q. So Pharaoh is four years old, correct?

A. Yes, ma'am.

Q. So you've had him since he was a year?

A. Yes, ma'am. Fifteen months.

Q. Okay. And how do they refer to you?

A. I tell them to address me by my name because bio mom wants that, but they prefer to say "Ms. Kendra" or "Mom," because I've had them so long.

Q. So they do refer to you as Mom?

A. Yes, ma'am, sometimes.

Q. Are you married?

A. No, ma'am.

***

Q. How was the child's behavior when they were expecting a visit from their mother and then that visit did not occur?

A. I will speak for Charlie first. If there was no visit, Charlie would know about it and she would be upset. She would be sad. She is not one -- that her schedule changes -- she knows when things -- when she's expecting things, she needs them to happen, and it would cause behaviors in the home with her as far as like lying about things or taking things that didn't belong to her, even acting out, so -- and her mood would change at school. So I would always tell her teacher, you know, She is expecting a visit, and if the visit doesn't happen, please be aware of these behaviors and let me know. She had certain triggers where she would, you know, may be physical with -- with children, and I know it was a result of not getting that visit and not seeing her birth mom. Pharaoh really doesn't know [Mother] -- or his birth mom, so it -- they didn't really affect him and they still don't. He still thinks that she's just someone he goes to see at McDonald's or whatever.

Q. Okay. So on or around 2017 -- March of 2017, were you supervising visits at that point?

A. I -- I may have. I may have. I would have to go back and check my records. I keep everything documented so -- yes, ma'am.

Q. So during that time period, around March 2017, were those visits consistent at all?

A. In March 2017, I would have to check my dates. I -- I don't believe. They have been -- even after the court order, they -- they still were sporadic. There still were visitation cancellations. They were still -- where she was late, so. . .

Q. Do you recall when that court order was, that she go to visitation?

A. Yes, ma'am. It was -- I believe it was 2016. Because Mom had just gotten back from Hawaii, I believe it was Hawaii, and she had went to jail, and that is when they ordered for them to be court ordered, because she wasn't going -- we hadn't had a visit in over two or three months.

Q. So there was a two- to three-month time period where the children didn't even see their mother?

A. Oh, yes, ma'am.

***

Q. Do you believe if the Court would allow the children to go home today that they would be in a safe and stable --

A. No --

Q. -- home environment?

A. -- ma'am.

Q. And why -- why do you not believe that?

A. I know for sure that the domestic violence is still a part of that -- that group, between the mom and the dad, and it's -- it's just not a life that I see for any child, not just these two children. They're not ready.

Q. And you say you know for a fact. How do you know --

A. We see it all over social media. We have seen fights, and we've seen things like that. In previous messages before, when me and Mom were communicating, she had said that it's not a safe place where she lived, in Summit Heights. It's not a place for children. Like, she wasn't ready because of that.

Q. And you said that there's been things on social media. Has there been videos between Mom and other people?

A. Well, there was -- there was a video posted on social media. Someone was live recording a fight, and Mom and [D.] was involved. And it seemed at one point that [D.] was trying to stop Mom, from what we heard, and it just progressed because I think they mentioned the children, and she just went from there.

Q. And so you knew for a fact that it was [Mother] --

A. Yes, ma'am.

Q. -- and Mr. [H.] that were involved in that altercation?

A. Yes, ma'am.

Q. To your knowledge, has [Mother] or Mr. [H.] provided any kind of support for the children?

A. Not to my knowledge.

Q. Has [Mother] had a job during the duration of this case --

A. Yes. I --

-13-

Q. -- that you're aware of?

A. -- believe she worked at -- she worked at Freddy's for a while, a restaurant, and I believe she worked at a factory. I'm not sure if she's employed now.

Q. Okay. And what is your employment?

A. I am assistant director at a childcare facility.

Q. And you're able to financially support both of the children?

A. Yes, ma'am.

Q. What effect do you believe -- if we were to change caretakers for [the Children] at this stage of their life, what effect do you think that would have on them?

A. It would be traumatizing.

Mother was the last witness to testify at trial. Mother testified to her efforts in the case to comply with her required tasks:

Q. Thank you. What was going on back in 2015 when your kids were removed?

A. Back in 2015 -- well, I was living with my dad. My dad had told me and my -- told me that me and my children had to leave, so I started staying with my mom's friend. Her house was gross.

Q. So at that time, basically in 2015, you didn't have a stable house after your dad kicked you and the kids out; is that correct?

A. Correct.

***

Q. Okay. Now, has there been some roadblocks in you completing some of the tasks?

A. As far as -- at one point, housing because of child support. It says 30 on my permanency plan, but state-wise, I was put on about 450 a month, so that was half of my check, and I was only making minimum wage. I was still homeless and finding jobs to work with having to do therapy and stuff, and then trying to, at that point, work with the fact that my children were put in custody.

Q. Okay. Now, you heard Ms. Holmes testify about your clinical assessment, that you had completed that, and the recommendation of weekly visits. And can you tell the Court why you were unable to do them every single week?

A. With weekly therapy, it was not available to me, because I am on TennCare, and the best they could do is biweekly. So that was why. And I tried to keep up with my biweekly therapy.

Q. Okay. And you are still doing that now?

A. Yes. I am not going to lie. I did fall off because of the breaking of my neck, but now that I am slowly recuperating, I'll be attending those.

Q. Okay. And you have had stable housing since 2016?

A. October 31, 2016. Yes.

Q. And when was the last time you had employment?

A. July 28, 2018.

Q. Okay. So you just recently got --

A. When my neck was broken, yes.

Q. Okay. Had you been working between 2015 and 2018?

A. On and off, correct.

Q. Okay. Had you been arrested multiple times by Mr. [H.]?

A. Correct.

Q. Did that impact whether you could sustain employment or not?

A. I mean, I couldn't work in jail, but, I mean, I never really had an issue getting a job after I got out.

Q. Okay. Now, they've mentioned -- Ms. Holmes had mentioned some type of altercation. You live in Summit --

A. Summit Heights, yes.

Q. Okay. Can you tell the Court what that altercation was about earlier this year?

A. That altercation had nothing to do with me. It was some "he say/she say" things, and somehow my name was bought up in it. They came to my residence. They threatened my family, my home. They started recording without my permission, of course, and they were arguing. Nothing was said about my children. When they decided to put hands on my mother, to put hands on [D.], that is when a fight ensued.

Q. Okay. So you were just acting in self-defense?

A. Correct.

Q. Okay. Now, no charges were brought up against any of the parties. Everything has been resolved and there's been no problems since then?

A. Correct.

Q. Okay. Now, on the public housing, I know you said you got that back in 2016.

A. (Nods head up and down.)

Q. When the kids were taken into state's custody, was the Department helping you to get housing, a bus pass, and get on your feet? Were they supposed to help you get all of that taken care of?

A. They were supposed to. My first caseworker, Meredith, I told her that if she were to have given me a note to give to Ms. Connie, a worker in public housing, saying -- stating that I needed a three-bedroom -- because at first, that's what they were requiring me to have, that they were -- I would have been able to move right then and there, which have been in that four-month period, but Ms. Meredith was kind of hesitant to give her that, and she didn't, so I lost that opportunity which put me on a one-bedroom list, which made me have to further wait. And I was not able to get on a two-bedroom list until I found out that I was pregnant with the twins.

Q. And did you get yourself on that list, or did the Department get you on that list?

A. I got myself on that list.

Q. Okay. Now, did they help you secure employment or facilitate that, or did you do that on your own also?

A. My own.

Q. Okay. Now, what about bus passes? Were they offering to provide you bus passes to help you since you didn't have a vehicle?

A. They offered bus passes. I believe I received two passes through them before.

Q. Okay. Otherwise you have taken care -- you've managed transportation on your own?

A. Yes.

Q. Now, early on, did you sign medical releases so the Department would have access to a lot of your records, everything you have been completing and done?

A. Correct.

Q. Okay. Now, on your visits, you have been visiting from day one, from the very beginning, sporadic, maybe, at times. How are those visits -- how have they gone, in your opinion, with being the one there?

A. At the beginning, I was trying the best as I could. Like, I was -- like I said, I was homeless, and I was doing the best that I could. It was -- it was kind of hard, because I had to leave. There was times where I was sick or I just couldn't make it -- didn't have any money. As of recently, even -- talking about as far as last year with being pregnant, I was going to -- making as many visits as possible. With a broken neck, I was going to my visits. I don't like missing visits. I don't like letting my children down, so I was doing the best as I possibly could.

Q. Did you ever ask the Department if they could help you with the transportation, taking you to and from your visits? Did they ever offer?

A. I -- to be honest, I stopped asking the Department for stuff because of their failure of -- they are not reliable, pretty much, so I stopped asking.

On cross-examination, Mother was asked as to her level of compliance with tasks related to domestic violence and treating her mental health issues, matters at the core of the case:

Q. (By Ms. Parker) And so you were diagnosed with manic depressive disorder and also bipolar disease. You were prescribed medication in 2015. And you stated just a second ago in your testimony that you're no longer on medication; is that correct?
A. Correct.
Q. Do you have a doctor's note that took you off that medication?
A. I had a psychiatric evaluation earlier this year that I did a medical release for, so I mean. . .
Q. But do you have a doctor's -- I understand you did a psychological evaluation. We don't have any record that you were taken off that medication. So do you have a doctor's note saying that you can come off of that medication?
A. I mean, I went through the same person who tried to put me on it -- or went through the same -- I went through Centerstone. So I had the release, like I was told to, but I see it this way: If that was an issue, why bring it up in court instead of in the CTFM [sic] that we had two months ago?
Q. I am just asking, do you have a doctor's note that took you off that medication?
A. No.
Q. And when's the last time that you took that medication?
A. 2015.
Q. Okay. And since 2015, you have had episodes with your anger; is that correct?
A. Correct.
Q. You've been arrested for domestic violence?
A. Correct.
Q. You were arrested for domestic violence after you took domestic violence classes?
A. Correct.
Q. And you continue to have issues with your anger; is that correct?
A. As of since when?
Q. You were arrested in July of 2018; is that correct?
A. No. I was arrested in May.
Q. So as of May of 2018, you continue to have problems with your anger; is that correct?
A. As of today, I don't, but in July, I did.

-17-

Q. And what have you done since your domestic violence classes and subsequently being arrested that would have taken care of your anger issues?

A. I have done a lot. I've read self-help books. I've started doing yoga. I've done a lot. Speaking to people. I mean, there's a lot of things that you can do without having to go the route that you would like for me to have taken.

Q. And your clinical assessment that you did on 4/14, it recommended the individual therapy. Do you have any kind of documentation before the Court -- you heard Ms. Holmes say that DCS doesn't have any documentation that you followed through even with biweekly therapy. So do you have any documentation, sitting here before the Court, that you're attending biweekly therapy?

A. I signed a release. That's all I can say.

Q. We don't have any documentation. So do you have any documentation that would say that you are continuing your biweekly therapy?

A. No.

Q. Okay. Are you seeing a case manager for any kind of medication management currently?

A. No. I'm not on medication.

Q. The A&D assessment that was just entered as an exhibit, it recommended that you have a relapse plan, get a sponsor, and submit to random screens. Do you have a sponsor currently?

A. No.

Q. Do you have a relapse plan just in case you relapse?

A. No.

Q. Have you participated in any kind of random drug screens?

A. No. I mean, not that anybody asked me for one. I can't make my own random drug screen.

Q. Well, when's the last time you took a drug screen?

A. I'm not -- probably July, maybe -- June.

Q. And there was an incident at that Foster Care Review Board between you and Charlie-Lynn. Would you like to tell the Court about that incident outside of Foster Care Review Board where you were asked to leave?

A. I was lied on in Foster Care Review Board, and I was upset with an adult. And my tone -- I had told Charlie -- I wanted to speak to Charlie so Charlie wouldn't be confused with me thinking I was telling her to lie. And my tone -- I was like, "I need to talk to you," and I guess that frightened her. I didn't mean to frighten her. But instead of letting me speak to her -- because she was crying -- and I want to console my child and tell her, Hey, I didn't mean to frighten you, but nobody gave me the opportunity to tell

-18-

her, Sorry, I didn't know that I frightened you. Because I walked outside, and when I came back in, she was crying. I didn't even realize that I made her cry. And nobody allowed me to tell her, Sorry; nobody allowed me to console her or to make it better. And I didn't speak to her for probably, like, a good two months after that. Nobody let me speak to her. So, I mean, you-all just let her sit there and boil and be frightened of me.

In December 2018, the Juvenile Court entered its final judgment terminating Mother's parental rights to the Children. The Juvenile Court found, by clear and convincing evidence, that the grounds of failure to establish a suitable home, substantial noncompliance with the permanency plan, and persistent conditions had been proven against Mother. The Juvenile Court also found, by clear and convincing evidence, that termination of Mother's parental rights is in the Children's best interest. The Juvenile Court stated, in part:

> The Court finds that in the four months after the removal, DCS made reasonable efforts to assist the mother in establishing a suitable home for the children. The reasonable efforts that DCS has made for [Mother] as evidenced by FSW Holmes' testimony, the petition and evidence presented at trial are as follows: providing the mother the case manager's business card with the case manager's name, office address, office telephone number, state cell phone number and e-mail address and instructing parent to contact the case manager at any time the parent needs assistance, providing to the mother directions to the DCS office, developing a permanency plan that outlines the specific tasks for the mother to complete in order for the children to return home, offering financial assistance in order for the mother to complete her required assessments, offering transportation to and from visits with the children, explaining that DCS would be available to conduct a walkthrough of the home once one was obtained, explaining that DCS could help in applying for public housing, and setting up the Flourishing Families program with the mother to aid in assisting with learning basic parenting skills to help parent her children.
>
> In the four months prior to the filing of the petition and even in the thirty-nine months after the removal of the children, the mother has not made even minimal efforts to improve her home or personal condition. [Mother] was advised on May 5th, 2015 and April 8th, 2016 and October 19th, 2016 that a failure to make reasonable efforts to establish a suitable home for the children in the first four months the children were in custody was grounds for termination of parental rights. [Mother] signed the acknowledgement of receipt of the Criteria and Procedure for Termination of Parental Rights on those date, and was provided with a physical copy of

-19-

the criteria. The mother's lack of concern for the children is to such a degree that it appears unlikely they will be able to provide a suitable home for the children at an early date.

The Department of Children's Services worked with the mother to assist her in finding a home and gave her certain tasks to perform. The tasks would have been related to what would be necessary to have a suitable home such as addressing her mental health issues, addressing her A&D issues, having a legal income, the ability to support the children. The testimony is on the ground of abandonment by failure to provide a suitable home; the mother just did not complete these tasks and did not have a home during the first four months the children were in custody. The Court would find that her failure to timely complete these tasks was the primary factor in her inability to provide a suitable home for the minor children. As we sit here today, the mother cannot provide a suitable home for the children.

***

At the outset, the Court finds that the requirements under the permanency plans for [Mother] . . . were clearly reasonable and related to remedying the conditions that warranted foster care for the children. This Court previously made such a finding when ratifying the first permanency plan on June 30th, 2015, and the second permanency plan on June 21st, 2016.

The two permanency plans required [Mother] to make voluntary child support payments in the amount of $30 per month, per child in foster care, complete a non-self-reporting alcohol and drug assessment and follow the recommendations, submit to random drug screens, sign proper documents and release of information in for DCS to obtain all assessment results, attend follow up appointments or additional services from the assessments, will demonstrate that she is able to provide proper supervision and care for her children, maintain a legal means of income, visit with the children, and provide safe, stable and suitable housing for the child, attend all court hearings, foster care review boards and Child and Family Team Meetings, and a clinical assessment and follow all recommendations. The second permanency plan required [Mother] to complete all of the same tasks as the first permanency plan. In addition, she was to resolve all legal issues.

Despite DCS's continuous efforts, [Mother] has not substantially complied with the responsibilities and requirements set out for her in the permanency plans. The mother got an A&D Assessment. She however, did not follow the recommendations from her A&D assessment. She was

recommended to formulate a relapse prevention plan, get a sponsor, pass random drug screens. The mother, by her own testimony did not complete any of these recommendations and, subsequently, relapsed, testing positive for THC. The mother has failed to make any child support payments, she participated in random drug screens, but frequently tested positive for drugs, the mother failed to establish a suitable home, and she has failed to provide proof of income. The mother did complete her Clinical/ Psychological Assessment, but she has failed to follow the recommendations of taking her medications as prescribed, Individual Therapy, Medication Management and following all recommendations from her mental health providers.

*** 

The children were found by this Court to be dependent and neglected on July 28th, 2015 due to [Mother's] mental health issues that le[d] her being hospitalized in a mental health facility, leaving the children without a caretaker. Since the children have been in custody, the mother has tested positive for illegal drugs, she has been multiple altercations with [D.H.] that le[d] to both her and Mr. [H.] being arrested for Domestic Assault charges and she has failed to address her mental health issues.

The conditions that led to the removal of the children still persist today. The Court would find that the best summary of the persistence of conditions ground can be found within the mother's own testimony. By her own admission, she did not have housing until October 31st, 2016; 18 months after the children came into custody. By her own testimony, she cannot support her children because she has no job. The mother stated in her testimony that she was mentally stable, however there is no proof before the court today that she completed a single task that would address her mental health issues.

There is no proof before the court that her mental issues have been addressed, just her testimony, "I am mentally stable". There is no testimony or letter from a therapist, no certificate of completion of a single class. There is nothing here that the Court can conclude that she has successfully addressed her mental health.

The mother testified that she has taken domestic violence classes and that her anger is under control. However, following her domestic violence classes, she was arrested for Domestic Assault. She was arrested as recently as five months ago. She has become disruptive in foster care review board to the point of making her child cry. The Court does not see

-21-

that in the thirty-nine (39) months that the children have been in custody that any of the conditions that led to their removal have been remedied.

The final prong that the Court must consider is whether the continuation of the parent/child relationship greatly diminishes the children's early integration into a safe, stable and permanent home. The testimony by FSW Holmes and the foster parent is that the children are in a pre-adoptive home, so an adoption could occur immediately if parental rights are terminated. The mother has provided no proof to the Court that she is in a position today to be able to properly care for the children in a safe and stable manner. Based on these observations, the conditions that necessitated foster care for the children still persist as we sit here today. Based on the history with the mother, the mother's insubstantial progress, there is little chance that these conditions will be remedied soon so that the children can be safely returned to the home. Therefore, prolonging the parent/child relationship clearly diminishes the children's chances of early integration into a safe, stable home. The Court would find that placing the children back in [Mother's] care would likely subject them to further abuse and neglect. Therefore, the Court terminates [Mother's] parental rights based on this ground.

***

The Court in determining whether the termination of parental rights is in the best interest of the children shall consider but not be limited to the following pursuant to TCA 36-1-113:

1. "Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian." The Court would find by clear and convincing evidence that no, those adjustments have not been made; that the mother has not provided proof that she has addressed her mental health issues; that she has not successfully gotten her problems under control that led to multiple arrests for domestic violence.

2. The Court will consider "whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." DCS has worked on this case now going on four years. And the Court is not satisfied that any adjustments that have been made will be lasting, if, in fact, adjustments have been made.

3. "Whether the parent or guardian has maintained regular visitation or other contact with the child." Early on, it was sporadic; it was not consistent; the mother would show up late. That would cause the children

-22-

to be upset. The visitations, even after being ordered by the Court to take place, have gone to therapeutic because the interactions were just not that good. . . .

4. "Whether a meaningful relationship has otherwise been established between the parent or guardian of the child." DCS has tried to create a meaningful relationship between the children and their parents. DCS began overnight visitations with the mother which had to be stopped because of additional domestic violence by [Mother] and Mr. [H.]. . . . So, the parents have not established that meaningful relationship.

5. "The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition." In this particular case, the children are in a loving environment in a three-bedroom house; they have a resource parent who intends to adopt; and they have got a mother that, as far as the Court can tell, there is no support in that home. Either there are additional people living with the mother or there's not. If there are additional people living there, the mother is in danger of getting kicked out of public housing. If they're not, she's there by herself with no job, no support. The Court will not place children in that situation -- also given the fact that I do not believe that the mother has addressed her mental health issues or her domestic violence issues . . . the Court cannot find where this situation would be in the best interest of these children.

6. "Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical or psychological abuse, or neglect toward the child, or another child." In this case, we've got a very dysfunctional relationship between [Mother] and Mr [H.] that has resulted in multiple arrests and multiple instances of domestic violence.

7. "Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such alcohol or controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner." The Court would fin[d], the only criminal conduct is continued domestic violence as recently as May of this year and some kind of altercation in Summit Heights. The Court is unaware of substances in the home, but there is no proof that the mother has successfully completed her A&D recommendations.

8. "W[he]ther the parents or guardians mental and/or emotional status would be detrimental to the child or prevent the parent or guardian to effectively providing safe and stable care and supervision for the child." The mother has a diagnosis of bipolar disorder. There is a prescription for medication. And as evidenced by the mother's testimony here today she is

not taking medication, and there's no proof from a medical care provider that it's okay for her not to take her medication.

9. "Whether the parent or guardian has paid child support consistent with the child support guidelines." The Court isn't going to follow the guidelines. The parents were ordered to pay a nominal $30 a month. The Court has not heard any proof that the mother paid $30 a month, and this is on two children. . . .

Mother timely appealed to this Court.

## Discussion

Although not stated exactly as such, Mother raises the following single issue on appeal: whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. Although Mother does not dispute grounds on appeal, we are obliged to review them anyway.

As our Supreme Court has instructed regarding the standard of review in parental termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483

S.W.3d at 525-26 (footnote omitted).  As such, we review each of the grounds for termination.

The Juvenile Court found that three grounds for termination against Mother had been proven by clear and convincing evidence.  These grounds, as they read in March 2017 when DCS filed its petition seeking to terminate Mother's parental rights, provided:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g).  The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113 (g)(1)-(3) (2017).[5]

_____

[5] Tenn. Code Ann. § 36-1-113(g)(3) was amended effective July 1, 2018.  DCS filed its petition seeking to terminate Mother's parental rights in March 2017.  We will apply the statute as it existed at the time the petition was filed.

The relevant definition of abandonment for purposes of this case, failure to establish a suitable home, provided as follows:

> (ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2017).

With respect to the ground of failure to establish a suitable home, the relevant four-month time period for examination is April 5, 2015, the day after the date of removal, up until August 4, 2015. The Juvenile Court found that, despite DCS's reasonable efforts to assist Mother, she never made even minimal efforts to improve her home or personal condition. The Juvenile Court found further that, despite being advised of the threat to her parental rights should she not act, "the mother just did not complete these tasks and did not have a home during the first four months the children were in custody." The evidence does not preponderate against these findings of fact by the Juvenile Court. We find and hold, as did the Juvenile Court, that the ground of failure to establish a suitable home was proven by clear and convincing evidence.

The second ground found against Mother was substantial noncompliance with the permanency plan. The Juvenile Court found that the requirements under the permanency plans "were clearly reasonable and related to remedying the conditions that warranted

foster care for the children." As to whether Mother complied with those responsibilities, we reiterate the findings of the Juvenile Court relative to this ground:

> Despite DCS's continuous efforts, [Mother] has not substantially complied with the responsibilities and requirements set out for her in the permanency plans. The mother got an A&D Assessment. She however, did not follow the recommendations from her A&D assessment. She was recommended to formulate a relapse prevention plan, get a sponsor, pass random drug screens. The mother, by her own testimony did not complete any of these recommendations and, subsequently, relapsed, testing positive for THC. The mother has failed to make any child support payments, she participated in random drug screens, but frequently tested positive for drugs, the mother failed to establish a suitable home, and she has failed to provide proof of income. The mother did complete her Clinical/ Psychological Assessment, but she has failed to follow the recommendations of taking her medications as prescribed, Individual Therapy, Medication Management and following all recommendations from her mental health providers.

The evidence does not preponderate against these findings of fact made by the Juvenile Court. While Mother took certain initial steps to meet her responsibilities under the permanency plans, she failed to follow through in key areas. Mother's failure to complete the plans is not a result of a good faith effort on her part that fell short. Instead, as reflected in her testimony, she unilaterally decided to go her own way. Perhaps no clearer or more crucial example in this case is Mother's failure to take her medication as prescribed. We find and hold, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan was proven by clear and convincing evidence.

The third ground for termination found against Mother was that of persistent conditions. It is undisputed that the Children were found to be dependent and neglected and had been removed from Mother's home for over six months. By trial, Mother had not fully addressed the issues that precipitated removal. The main barriers to Mother's reunification with the Children throughout this case have been her mental health situation and domestic violence. Indeed, Mother was arrested for domestic violence after having completed domestic violence classes. We have only Mother's word to go on that she has resolved her mental health issues and proclivity toward violence. Meanwhile, in contrast, the evidence is uncontroverted that the Children are thriving in Foster Mother's care. We find and hold, as did the Juvenile Court, that the ground of persistent conditions was proven by clear and convincing evidence.

We next address the sole issue Mother raises on appeal, which is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. With respect to determining a child's best interest in the context of termination of parental rights, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the

obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The statutory factors to be considered by courts when making this best interest determination are as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance

analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(2017).

The Juvenile Court made detailed findings as to the Children's best interest. In so doing, the Juvenile Court considered the statutory factors. The findings, quoted in the background portion of this Opinion, are unfavorable to a continuation of Mother's parental rights. The Juvenile Court concluded by finding, under the clear and convincing standard, that termination of Mother's parental rights is in the Children's best interest.

Mother argues on appeal that termination of her parental rights is not in the Children's best interest for a handful of reasons. First, Mother asserts that she went through eight DCS caseworkers since 2015 and that DCS in general was of little help. Mother notes that she has had housing since October 2016 and that she supports herself. Mother has continued to visit with the Children and a bond still exists. Mother states that she has benefitted from domestic violence classes. All in all, according to Mother, she "is getting back on her feet" and terminating her parental rights now would be "illogical." We, as did the Juvenile Court, respectfully disagree with Mother.

This case began with the Children's removal from Mother's care after she was involuntarily hospitalized. Mother has been diagnosed with bipolar disorder. We have only Mother's word to go on that she is adequately managing her mental health issues. We do know that Mother has been off of her prescribed medication since 2015, apparently without medical recommendation or approval. This is a point of major concern. Mother's mental and emotional status bears directly on whether she could safely parent the Children. Mother being strictly compliant with medication management and following through on all recommendations from healthcare providers would be the bare minimum she would need to do in order for a reunification with the Children to be contemplated. In light of Mother's seeming nonchalance about her mental health issues, there is troubling uncertainty about her prospects for safely parenting the Children any time soon.

-33-

In contrast with Mother's uncertainty, the uncontroverted evidence from trial is that the Children are thriving in Foster Mother's care. The Children have lived with Foster Mother for a number of years now. The Children deserve permanency, and keeping the door open to a speculative scenario where Mother sometime in the future may become capable of parenting them only prolongs their limbo.

The evidence does not preponderate against any of the Juvenile Court's findings relevant to the Children's best interest. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest. We affirm the judgment of the Juvenile Court.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Matia P., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE